UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                        :
KERRIN RANDOLPH,                        :
                   Plaintiff,           :        17cv1433 (DLC)
                                        :
        -v-                             :        OPINION AND ORDER
                                        :
METROPOLITAN TRANSPORTATION AUTHORITY,  :
RAYMOND FOY, Individually, RAHIM        :
BRADSHAW, Individually, ANTHONY         :
TORTORA, Individually, JOSE DERAS,      :
Individually, and JOHN and JANE DOE     :
1through 10, Individually (the names    :
John and Jane Doe being fictitious, as  :
the true names are presently unknown),  :
                                        :
                   Defendants.          :
                                        :
-------------------------------------- X

APPEARANCES:

For the plaintiff:
Brett H. Klein
Lissa Green-Stark
Brett H. Klein, Esq. PLLC
305 Broadway, Suite 600
New York, NY 10007

For the defendants:
Tina S. Bhatt
Joshua Deal
Landman Corsi Ballaine & Ford P.C.
120 Broadway, 27th Floor
New York, NY 10271

DENISE COTE, District Judge:

    Kerrin Randolph brings this action against the Metropolitan

Transportation Authority ("MTA"), Metropolitan Transportation

Authority Police Department ("MTAPD") Sergeant Jose Deras, and

MTAPD police officers Raymond Foy, Rahim Bradshaw, and Anthony

Tortora, pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), and § 504 the Rehabilitation Act. Defendants have moved for summary judgment on all claims. For the following reasons, the defendants' motion is granted in part.

<u>BACKGROUND</u>

Unless otherwise noted, the following describes the evidence which is either undisputed or taken in the light most favorable to the plaintiff.

I. Grand Central Station and the Station Master's Office

Kerrin Randolph is a homeless man who uses an electric, rechargeable wheelchair. While he can stand on his own without the support of the wheelchair for up to ten minutes, he asserts he cannot walk without the aid of the wheelchair. He regularly spends much of his week at Grand Central Station (the "Station"). He often charges his electric wheelchair at the Station.

On February 24, 2016, the named defendants, a sergeant and officers of the MTAPD, were assigned to patrol the Station. Plaintiff contends that he was at the Station to charge his wheelchair and because he was planning to take a train to Mount Vernon. At some point after arriving at the Station, he went to

2

the Station Master's Office ("SMO") to charge his electric wheelchair. The SMO is a separate waiting room in the Station, open only to passengers with tickets. MTAPD officers routinely patrol the SMO to check for tickets.

Before he began to charge his electric wheelchair, Randolph was approached by an officer and by members of the Bowery Residents' Committee ("BRC"), a group that helps MTAPD officers check on the well-being of and provides services for undomiciled people. Plaintiff claims the first officer he interacted with was Officer Tortora; Sergeant Deras, however, claims that he was the first officer to approach the plaintiff, along with the BRC representatives. The plaintiff was asked to produce a ticket, which the plaintiff asserts he possessed and produced. The plaintiff asserts that he also told the officer that he had been given permission by an SMO employee to charge his wheelchair using an outlet in the SMO and that the employee confirmed that she had given such permission. The MTAPD officer told the plaintiff he would come back later.

## II. The Arrest

After the first encounter with an MTAPD officer, four MTAPD officials -- Sergeant Deras and Officers Foy, Bradshaw and Tortora -- returned to the SMO. Randolph claims the officers returned only 15 or 20 minutes after his first discussion;

defendants claim that they returned four hours later. The plaintiff was still in the SMO, in the same spot, charging his wheelchair. The officers split up: Bradshaw and Tortora went to check tickets of others in the SMO, Deras and Foy approached the plaintiff. It is disputed at what point Bradshaw and Tortora came over to the plaintiff.

Randolph was again asked to produce a ticket. Randolph testified that he handed his ticket to Deras and that Deras acknowledged it was a valid ticket. Randolph testified that Deras then told him that he could be arrested for theft of services for stealing electricity by charging his wheelchair. Randolph told Deras that he had received explicit permission to charge his wheelchair from an SMO employee, pointing in the direction of the employee he had earlier identified when he was first approached by MTAPD officers to confirm he had received permission to charge his electric wheelchair. Randolph testified that Deras responded with "so what," and maintained that he could charge Randolph with theft of services. At that point, the plaintiff responded, although the volume and content of his response is disputed. Randolph claims that he responded with questions like: "Are you kidding?" and "Are you serious?" and "Are you an idiot?" and that he questioned Deras' authority, whereas defendants claim that he began to yell, curse, and launch racial epithets at Deras.

Deras then directed Foy to issue Randolph a summons for disorderly conduct and theft of services. Randolph was agitated, although it is again disputed how he displayed that agitation. Foy's memo book, indicating Foy's impression of the incident, notes that the plaintiff was uncooperative, but not combative.[1] Foy has testified that Randolph was "escalating" the situation and raising his voice. Deras instructed Foy to arrest the plaintiff.

Foy and Deras handcuffed Randolph behind his back while he was still in his wheelchair. Deras then attempted to remove the plaintiff from his wheelchair. Randolph testified that he was lifted from his wheelchair and pushed to the floor, Deras telling him that he could walk. Randolph adds that an officer then forcefully pulled and dragged him, by the shoulder and by his handcuffs, into a corner on the floor.

The officers tell a different story. They claim that, once it was apparent that the plaintiff could not walk, they assisted him to the ground, next to his wheelchair, and propped his back against the wall for support. They called for a substitute, manual wheelchair to transport Randolph out of the SMO.

---

[1] Foy's memo book also indicates that the plaintiff informed the officers that he had received permission to charge his wheelchair from an SMO employee. The memo book notes that the plaintiff produced a valid ticket. The plaintiff had purchased the ticket several days earlier.

III. Transport to the Hospital

After a manual wheelchair arrived, Randolph was placed into it.  Randolph claims he was not secure in the wheelchair and so he fell out of it as the officers pushed it.  He claims that, when he fell out of the manual wheelchair, he fell face first, hit his head, and blacked out.  The next thing he remembers is being in an ambulance on the way to the hospital.

The officers, however, contend that Randolph was purposefully flailing in the wheelchair, in an attempt to get out of it.  They had to hold him back in the wheelchair to prevent him from falling, which they claim he never did.  They claim he was writhing and screaming while he was in the wheelchair.  He shouted that he was in pain.  The officers requested Emergency Medical Services ("EMS").  EMS officers arrived, transferred Randolph to a stretcher, placed him in an ambulance, and transported him to Bellevue Hospital. The defendants testified and indicated in their warrant report that, after the plaintiff was arrested, they discovered that Randolph had an outstanding NYPD warrant.  Defendants notified the NYPD, but the NYPD declined extradition.  Plaintiff denies any knowledge of any existing warrants.

Ultimately, the defendants voided Randolph's arrest, instead issuing a summons for disorderly conduct.  They gave him

the summons while he was at Bellevue Hospital.  He was released from MTAPD custody.  On May 15, 2016, Randolph accepted an adjournment in contemplation of dismissal ("ACD") under New York Criminal Procedure Law § 170.55.

IV. Hospitalization and Treatment

At Bellevue, after an MRI was conducted, a radiologist found "[n]o acute fracture or sublaxation."  The plaintiff did not present with bruising, abrasions, or visible soft tissue damage.  He was diagnosed with muscle spasms, and prescribed medicine to treat those spasms.  At the hospital, plaintiff also saw a neurologist.  He complained to the neurologist of stiffness and pain, which the neurologist determined were a result of muscoskeletal issues.  The medical records record that Randolph had "no new neurologic deficits" from the incident.

After being prescribed medicine to treat his spasms, plaintiff was discharged, but he refused to leave the hospital, demanding to be taken to a nursing home because he was still in pain.  The hospital staff noted that he did not need to be taken to a nursing home.  He was given a twenty-four hour notice.  The records indicate that, when he was discharged again on February 27, he "feigned a fall out of his motorized wheelchair." Hospital staff saw this, and continued to discharge him.  When he was in the hospital lobby, according to the records, he

"slowly fell out of his chair again, complaining that he was not properly strapped in."  He was sent to the emergency room for further evaluation, and medical staff determined that he had not sustained any injury from the fall in the lobby.  He was finally discharged the next day.

This action was commenced on February 24, 2017.  The plaintiff filed an amended complaint on May 19, 2017.  Following the completion of discovery, the defendants moved for summary judgment on November 28.  The motion became fully submitted on January 8, 2018.


DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992);

<u>Gemmink v. Jay Peak Inc.,</u> 807 F.3d. 46, 48 (2d Cir. 2015).

"[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted) (emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," <u>Ridinger v. Dow Jones & Co. Inc.</u>, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts."  <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine and material

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

The plaintiff brings various claims pursuant to 42 U.S.C. § 1983: false arrest, excessive force, denial of a fair trial, failure to intervene, and supervisory liability.[2]  To sustain a Section 1983 claim, the plaintiff must show that he was "deprived of rights, privileges, or immunities secured by the Constitution and laws [of the United States]" by a person acting under color of state law.  Burg v. Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted).  He also brings claims for false arrest, assault and battery, and negligence under New York law, and claims under the ADA and the Rehabilitation Act.

I. Unlawful Arrest

A false arrest claim requires a plaintiff to prove "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not

---

[2]Plaintiff withdrew or abandoned the following claims: malicious prosecution under § 1983 (Count 4), municipal liability under § 1983 (Count 8), malicious abuse of process under New York law (Count 12), negligent screening, hiring, and retention under New York law (Count 13), negligent training and supervision under New York law (Count 14), and violation of the New York State Constitution (Count 16).

otherwise privileged." Liranzo v. United States, 690 F.3d 78,

95 (2d Cir. 2012) (citation and emphasis omitted). The

requirements are "substantially the same" under New York state

law. Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir.

2015) (citation omitted). "To avoid liability for a claim of

false arrest, an arresting officer may demonstrate that either

(1) he had probable cause for the arrest, or (2) he is protected

from liability because he has qualified immunity." Id.

"Probable cause is determined on the basis of facts known

to the arresting officer at the time of the arrest." Shamir v.

City of New York, 804 F.3d 553, 557 (2d Cir. 2015) (citation

omitted).

> In general, probable cause to arrest exists when the
> officers have knowledge or reasonably trustworthy
> information of facts and circumstances that are sufficient
> to warrant a person of reasonable caution in the belief
> that the person to be arrested has committed or is
> committing a crime.

Gonzalez v City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013)

(citation and emphasis omitted). "The inquiry is limited to

whether the facts known by the arresting officer at the time of

the arrest objectively provided probable cause to arrest." Id.

(citation omitted). Officers do not have a duty to "investigate

exculpatory defenses offered by the person being arrested or to

assess the credibility of unverified claims of justification

before making an arrest." Jocks v. Tavernier, 316 F.3d 128, 136

(2d Cir. 2003). Officers, however, are not permitted to "deliberately disregard facts known to [them] which establish justification." Id. When making the probable cause determination, a court considers all "the facts available to the officer at the time of the arrest." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997). Where multiple officers cooperate in an investigation, the "collective knowledge doctrine" applies to the determination of probable cause.

> The collective knowledge doctrine provides that, for the
> purpose of determining whether an arresting officer had
> probable cause to arrest, where law enforcement authorities
> are cooperating in an investigation, the knowledge of one
> is presumed shared by all.

Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) (citation omitted). "[S]ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir.2007).

As a threshold matter, Randolph's acceptance of an ACD does not bar his false arrest claims. Under New York law, "while the favorable termination of judicial proceedings is an element of a claim for malicious prosecution [it is] not an element of a claim for false arrest." Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996). The defendants assert that there was probable cause

to arrest Randolph for charging his wheelchair in violation of
21 N.Y.C.R.R. 1085.13, and for disorderly conduct in violation
of N.Y. Penal Law § 240.20.

Rule 1085.13 states, in relevant part: "No person shall
. . . plug a television, radio or other electrical device into
any outlet or connect any device to any utility at or in any
facility or train, except with the permission of an authorized
Metro-North employee."  21 N.Y.C.R.R. § 1085.13.  Here, it is
undisputed that Randolph was charging his electric wheelchair in
the SMO.  It is also undisputed that Foy learned at some point
that someone had given Randolph permission to do so.  Randolph
testified that, when Deras first told him that he could be
charged with theft of services for charging his wheelchair, he
pointed to an SMO employee and said that she had given him
permission to charge the wheelchair.  While police officers are
generally not under a duty to investigate every possible
exculpatory defense before effectuating an arrest, in this case,
determining whether Randolph had permission from a nearby SMO
employee was a simple, and quick, task.  Any officer could have
easily inquired of the employee in the SMO.  Summary judgment,
therefore, cannot be granted here because Randolph has offered
evidence that the arresting officer learned prior to the arrest
that Randolph had permission to charge his electric wheelchair.

The defendants argue that even if they learned before Randolph's arrest that Randolph had received permission to charge his wheelchair in the SMO, there is no evidence that the officers believed that the employee that Deras claims he identified had authority to give such permission. The defendants provide no evidence, however, that they believed that the identified employee lacked such authority or that employees in the SMO lacked such authority. The New York regulation states that a person may use an outlet "with the permission of an authorized Metro-North employee." 21 N.Y.C.R.R. § 1085.13.

Summary judgment is also unavailable with respect to the disorderly conduct charge.

> To prove the crime of disorderly conduct under N.Y. Pen. L. § 240.20 the prosecution must establish three elements: (i) the defendant's conduct must be public in nature, (ii) it must be done with intent to cause public inconvenience, annoyance or alarm or with recklessness as to a risk thereof, and (iii) it must match at least one of the [seven] descriptions set forth in the statute.

Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001) (citation omitted). A person's conduct falls in the seven subdivisions of Section 240.20 if:

> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
> 4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
> 5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N. Y. Pen. L. § 240.20.  Here, subdivisions (2) and (3) may apply to Randolph's conduct.

While it is undisputed that the interaction between Randolph and the defendants was in a public place, it is disputed whether Randolph screamed, cursed, used abusive language or otherwise engaged in behavior that constitutes disorderly conduct.  While Randolph admits to asking Deras if he was an "idiot," he asserts that he did not raise his voice.  He denies using any curse words towards the officers.  Foy's memo book notes that, while Randolph was "uncooperative," he was "not combative" and was not "volatile" until after Deras ordered Foy to arrest him.[3]  The defendants do not argue that calling a police officer an idiot and otherwise calmly questioning his authority, without more, is sufficient to create probable cause to arrest for disorderly conduct.

The defendants argue that they are entitled to qualified immunity.  "An officer is entitled to qualified immunity against

---

[3] Defendants inexplicably argue at one point that Randolph does not dispute that he "used loud, abusive language and was verbally combative" but then acknowledge that Randolph "denies yelling or raising his voice."  Randolph testified that he did not raise his voice.

a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (citation omitted). The same disputes of fact that prevent summary judgment on the false arrest claim prevent a finding of qualified immunity.

II. Excessive Force

Randolph asserts in opposition to this motion that Deras used excessive force when he pulled Randolph from his electric wheelchair and pushed him down to the floor.[4] "[L]aw enforcement officers violate the Fourth Amendment if the amount of force they use is objectively unreasonable in light of the facts and circumstances confronting them." Rogoz v. City of Hartford, 796 F.3d 236, 246 (2d Cir. 2015) (citation omitted). Every arrest carries with is the right to use "some degree of physical coercion." Id. (citation omitted). In light of the "fact-specific nature" of the inquiry on an excessive force claim, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively

---

[4] The plaintiff has abandoned any excessive force claim against any defendant other than Deras, including any claim that they failed to intervene in Deras' use of force. He has not offered any evidence that Deras was the officer who allegedly pulled him into a corner.

unreasonable." Amnesty America v. Town of West Hartford, 361

F.3d 113, 123 (2d Cir. 2004). On the other hand, it is well

established that "[n]ot every push or shove, even if it may

later seem unnecessary in the peace of a judge's chambers,

violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386,

396 (1989). "The reasonableness of the use of force is

evaluated under an objective inquiry that pays careful attention

to the facts and circumstances of each particular case." County

of Los Angeles, Calif. v. Mendez, 137 S. Ct. 1539, 1546 (2017)

(citation omitted).

Summary judgment on the excessive force claim is granted.[5]

The excessive force claim is based solely on the allegations

that Deras forced Randolph from his wheelchair and pushed him to

the ground in order to effectuate an arrest. Randolph has not

offered competent evidence that Deras' act of pushing Randolph

to the ground caused anything more than the harm of offensive

touching. It would be entirely speculative for a jury to find

that any of the stiffness, pain, spasms, or strain reflected in

the hospital records were caused by Deras, as opposed to

attributable to preexisting medical issues that Randolph suffers

---

[5] Randolph also brings a separate claim against Deras for
liability as a supervisor. This claim is dismissed as
duplicative. It is undisputed that Deras was personally
involved in the incidents at issue here, and the supervisory
claims against him are premised on that direct involvement.

from, issues which cause him to rely on the use of a wheelchair.
If there was probable cause for the arrest, then Deras was
entitled to remove Randolph from his wheelchair when taking
Randolph into custody, and Randolph does not suggest otherwise.

Even if there was not probable cause for the arrest, any
touching of Randolph would not automatically be rendered
unlawful.  The Second Circuit has specifically declined to rule
that "in the absence of probable cause for an arrest, any force
that was used in making the arrest[] was excessive."  Zellner v.
Summerlin, 494 F.3d 344, 378 (2d Cir. 2007) (citation omitted).
See also County of Los Angeles, 137 S. Ct. at 1547 ("the
objective reasonableness analysis must be conducted separately
for each search or seizure that is alleged to be
unconstitutional"); Dancy v. McGinley, 843 F.3d 93, 104 n.8 (2d
Cir. 2016) (noting the "absence of precedent for proposition
that use of force is necessarily excessive when there is no
probable cause to arrest") (citation omitted).


III. Assault and Battery

Deras is not entitled to summary judgment on Randolph's
claim for assault and battery.  "Under New York Law, an assault
is an intentional placing of another person in fear of imminent
harmful or offensive contact."  Girden v. Sandals Int'l, 262

F.3d 195, 203 (2d Cir. 2001) (citation omitted). "A battery is
an intentional wrongful physical contact with another person
without consent." Id. (citation omitted). To succeed on an
assault or battery claim in the law enforcement context, a
plaintiff must demonstrate that defendants' conduct "was not
reasonable within the meaning of the New York statute concerning
justification for law enforcement's use of force in the course
of performing their duties." Nimely v. City of New York, 414
F.3d 381, 391 (2d Cir. 2005).

While New York law regarding assault and battery generally
parallels federal law regarding excessive force, see Posr v.
Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991), under New York law,
assault and battery claims can be said to be more plaintiff
friendly than claims brought under § 1983 for excessive force,
because under New York law, if an arrest is determined to be
unlawful, any use of force against a plaintiff may constitute an
assault and battery. See Wyllie v. District Atty. of County of
Kings, 2 A.D.3d 714, 718 (N.Y. App. Div. 2003) ("an assault and
battery cause of action may be based on contact during an
unlawful arrest"); Johnson v. Suffolk County Police Dept., 245
A.D.2d 340, 440-41 (N.Y. App. Div. 1997) ("As the arrest of the
plaintiff by the defendant police officer . . . was unlawful,
[the officer] committed a battery when he touched the plaintiff
during that arrest."). In short, the objective reasonableness

standard applied to § 1983 claims, see Jones v. Parmley, 465
F.3d 46, 62 (2d Cir. 2006), does not apply to claims brought
under New York law for assault and battery if there has been an
unlawful arrest, regardless of whether any force would be deemed
reasonable if applied during a lawful arrest.

Because genuine issues of material fact exist as to whether
the defendants had probable cause to arrest Randolph, a material
issue of fact exists as to whether Deras assaulted Randolph by
removing him from the wheelchair and pushing him to the ground
as he arrested him.  Deras is not entitled to summary judgment
on the assault and battery claim.


IV. Denial of a Fair Trial

Randolph asserts that the defendants violated his right to
a fair trial when they included in his summons the assertions
that he had engaged in "disorderly conduct" and made
"unreasonable noise."

> When a police officer creates false information likely to
> influence a jury's decision and forwards that information
> to prosecutors, he violates the accused's constitutional
> right to a fair trial, and the harm occasioned by such an
> unconscionable action is redressable in an action for
> damages under 42 U.S.C. § 1983.

Ricciuti, 124 F.3d at 130.  Fair trial claims based on
fabrication of evidence are restricted to those cases in which
an

```
(1) investigating official
(2) fabricates information
(3) that is likely to influence a jury's verdict,
(4) forwards that information to prosecutors, and
(5) the plaintiff suffers a deprivation of life, liberty,
or property as a result.
```

Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir.

2016).  A plaintiff may bring a fair trial claim even if the

plaintiff's criminal case is dismissed before trial.  Ricciuti,

124 F.3d at 127, 130.

Foy is entitled to summary judgment on the fair trial

claim.[6]  Foy issued the summons to Randolph when Randolph was in

the hospital.  Pursuant to the summons, Randolph appeared once

in court and ultimately agreed to resolve the summons through

accepting an ACD.

The two phrases at issue here -- "disorderly conduct" and

"unreasonable noise" -- are characterizations of behavior,

reflecting an officer's qualitative assessment.  They do not

constitute descriptions of facts that could constitute

fabricated evidence.  After all, the plaintiff does not dispute

that he had a disagreement with the officers at the SMO about

---

[6] While the plaintiff does not specify that the fair trial claim
is asserted against Foy specifically, given that the claim is
based on the summons, and that Randolph alleges that Foy wrote
and issued the summons to him, this claim may only be asserted
against Foy.

his right to use its electrical outlet and that he argued with
Deras about that.

Nor has Randolph offered evidence that the two phrases on
the summons would be likely to influence a jury.  A summons is
not generally introduced as evidence at criminal trials.  If
called as a witness at a criminal trial, Foy would have been
required to describe in detail precisely what he saw and heard.
The use of conclusory descriptions would not have sufficed to
obtain a conviction.

Finally, Randolph's allegations do not establish that he
suffered a deprivation of life, liberty, or property as a result
of Foy's conduct.  He was not detained in a jail or precinct.
He made one court appearance.  Although courts in this Circuit
have found that attending multiple follow-up court appearances
may constitute a sufficient deprivation of liberty, the
plaintiff, and this Court, have identified no case in which a
single court appearance sufficed.  See, e.g., Collins v. City of
New York, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (noting that
"the obligation to attend numerous follow-up court appearances"
has been found to "constitute a sufficient deprivation of
liberty") (emphasis added);  Baksh v. City of New York, 15cv7065
(NGG), 2018 WL 1701940, at * 10 (E.D.N.Y. Mar. 31, 2018)
("Plaintiff's initial detention, combined with his [two]
subsequent court appearances and community service, clearly

constitutes a deprivation of liberty supporting a fair-trial claim.").

## V. ADA and Rehabilitation Act Claims

Randolph asserts that the MTA violated his rights under the ADA and Rehabilitation Act when Deras forced him out of his wheelchair and pushed him to the ground.[7]  Title II of the ADA "provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Section 504 of the Rehabilitation Act prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against otherwise qualified disabled individuals."  McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012) (citing 29 U.S.C. § 794(a)).  "Because the standards adopted by the two statutes are nearly identical, [courts] consider the merits of these claims together."  Id.

---

[7] The plaintiff also asserts that he suffers from right side hemiparesis which meant that his right arm should not have been placed behind his back when the officers handcuffed him. Because Randolph has not offered evidence, inter alia, that this condition constituted a disability as defined in these statutes, this portion of his claim is dismissed on summary judgment.

To prevail on claims brought under Title II of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must show that:

> (1) he is a qualified individual with a disability;
> (2) the defendant is subject to one of the Acts; and
> (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability.

Id. A defendant discriminates under Title II of the ADA and the Rehabilitation Act "when it fails to make a reasonable accommodation that would permit a qualified disabled individual to have access to and take a meaningful part in public services." Id. (citation omitted).

Although the Second Circuit has yet to address the issue directly, multiple courts in this district have held that liability under the ADA and the Rehabilitation Act may be established if police officers, in executing an arrest, fail to provide a reasonable accommodation for a plaintiff's disability during the course of an arrest and post-arrest, causing the plaintiff to suffer "greater injury or indignity than other arrestees." See, e.g., Hays v. City of New York, 14cv10126(JMF), 2017 WL 782496, at *4 (S.D.N.Y. Feb. 28, 2017); Morales v. City of New York, 13cv7667(RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sep. 7, 2016); Wagner v. City of New York, 14cv2521(VEC), 2015 WL 5707326, at *7 (S.D.N.Y. Sep. 28, 2015).

See also Valanzuolo v. City of New Haven, 972 F. Supp. 2d 263, 273-74 (D. Conn. 2013) ("Under the ADA, law enforcement officers have a duty to provide arrestees who are disabled with reasonable accommodations once an arrest of a disabled person had been accomplished.").

It is undisputed that Randolph has a disability: he is physically impaired and requires the use of a wheelchair to ambulate. There is also no dispute that the MTA is a public entity that receives federal assistance and is subject to both statutes. Thus, Randolph satisfies the first two required elements with respect to his ADA and Rehabilitation Act claims. He, however, fails with respect to the third element: whether he was discriminated against when the defendants failed to provide him with a reasonable accommodation for his disability. See McElwee, 700 F.3d at 640.

The MTA officers accommodated Randolph's disability by requesting a substitute, manual wheelchair to transport him. Randolph argues the use of a substitute wheelchair was not necessary and, in any event, forcibly removing him from his electric wheelchair and placing him in a manual wheelchair was a violation of the statutes. The use of a substitute wheelchair was a reasonable accommodation given the circumstances of the plaintiff's arrest: his arrest was directly linked to the use of the SMO's outlet to charge his electric wheelchair. Randolph

does not suggest that the officers would have been able to operate his electrically motored wheelchair while he sat in it, handcuffed. Under the circumstances, it was reasonable for the defendants to provide a different wheelchair to transport Randolph.

VI. Negligence Claim

Randolph asserts that the defendants were negligent when they failed to secure him in the substitute wheelchair following his arrest. Randolph's negligence claim must be dismissed. "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." Watson v. United States, 865 F.3d 123, 134 (2d Cir. 2017) (citation omitted). The defendants placed Randolph in the substitute wheelchair in order to effectuate his arrest. The claim is therefore barred.[8]

VII. Punitive Damages

---

[8] In his opposition to the motion, Randolph clarifies that his negligence claim is not based the conduct that underlies his excessive force claim, i.e., on removing him from his wheelchair and pushing him to the ground. Randolph concedes that any negligence claim based on that conduct would be barred, given that, under New York law, a plaintiff cannot assert a claim for negligence based on the same facts that support a claim for assault and battery. See United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 553 (2d Cir. 1993) (recognizing the "the mutual exclusivity of negligence and battery").

Acknowledging that he may not recover punitive damages against municipalities or individuals sued in their official capacities, Randolph seeks punitive damages against the individual defendants.  "Punitive damages may be awarded for violations of federal law where a defendant acts with reckless or callous disregard for the plaintiff's rights, and intentionally violates federal law."  Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 909 (2d Cir. 1993) (citation omitted).  The issue of whether defendants' conduct is sufficiently serious to warrant punitive damages is a question best left to the jury.  See, e.g., Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 613 (S.D.N.Y. 2013) ("Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiffs proof of sufficiently serious misconduct.")  Given the issues of fact that remain to be resolved by a jury, principally whether there was probable cause for the arrest, summary judgment as to Randolph's claim for punitive damages cannot be granted at this juncture.


CONCLUSION

The defendants' November 28, 2017 motion for summary judgment is granted as to the following claims: the use pf excessive force; failure to intervene; supervisory liability;

27

denial of a fair trial; violations of the ADA and the Rehabilitation Act; and negligence. The claims that remain for trial are false arrest in violation of 42 U.S.C. § 1983, false arrest and assault and battery under New York state law. The question of whether the plaintiff is entitled to punitive damages is a question reserved for the jury.


Dated:    New York, New York
          June 12, 2018

                              _____
                                   DENISE COTE
                          United States District Judge